**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta
OCT 28 2026
KEVIN P. WEIMER, Clerk
By: Deputy Clerk

SANASSA DIANE,

Plaintiff,

v.

DELTA AIR LINES, INC.,

Defendant.

CIVIL ACTION FILE

NO. 1:26-CV-6548

JURY TRIAL DEMANDED

## COMPLAINT

COMES NOW Plaintiff, Sanassa Diane ("Plaintiff"), appearing pro se, and files this, her Complaint against Defendant Delta Air Lines, Inc. ("Defendant" or "Delta"), and states as follows:

## I. INTRODUCTION

1.

This is an action brought by Plaintiff Sanassa Diane under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §§ 2000e et seq.; the Americans with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. §§ 12101 et seq.; and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 et seq., against Defendant Delta Air Lines, Inc. for the unlawful suspension and termination of Plaintiff's employment in violation of those statutes.

2.

After seven years of employment and four promotions, including two in 2024, Plaintiff engaged in protected activity under each of these statutes. Beginning April 15, 2025, she took FMLA leave for disabling medical conditions, and on June 2, 2025, she complained in writing, both by email to her manager and senior leadership and through Delta's Ethics and Compliance Helpline, that her manager was interfering with that leave (FMLA and ADA). On June 5, 2025, she filed an internal complaint of national origin discrimination (Title VII). On June 22, 2025, she requested a disability accommodation and notified Delta of the religious basis for the conduct under investigation (ADA and Title VII). An investigation that had sat idle for approximately 81 days was revived after her complaints, and Delta suspended her on June 26, 2025 and terminated her on July 16, 2025, while she remained on approved medical leave. Plaintiff would not have been suspended or terminated but for that protected activity. Defendant is directly and vicariously responsible for the unlawful conduct of its managers and employees described below.

## II. JURISDICTION AND VENUE

3.

This Court has original subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because each of Plaintiff's claims arises under federal law: Counts I

through III arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.; Counts IV through VII arise under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq.; and Counts VIII and IX arise under the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 et seq. Jurisdiction is also conferred by 42 U.S.C. § 2000e-5(f)(3), which applies to the ADA claims through 42 U.S.C. § 12117(a), and by 29 U.S.C. § 2617(a)(2).

4.

This Court has personal jurisdiction over Defendant Delta Air Lines, Inc. ("Delta" or "Defendant") because Delta is a Delaware corporation with its principal place of business at 1030 Delta Boulevard, Atlanta, Georgia 30354, within this judicial district. Delta is therefore at home in Georgia. Plaintiff worked at Delta's Technical Operations facility at 1775 M H Jackson Service Road, Atlanta, Georgia 30354, where her manager, Ms. Smith, also worked. Upon information and belief, the investigation, suspension, and termination decisions at issue were made, reviewed, and communicated by Delta personnel in Atlanta.

5.

Venue is proper in this Court under 42 U.S.C. § 2000e-5(f)(3), which governs the Title VII and ADA claims, because Plaintiff worked in this district and would have continued to work here but for the unlawful employment practices alleged, the relevant employment records are maintained here, and the challenged

decisions were made here. Venue is also proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in this district and a substantial part of the events giving rise to the claims occurred here. Events at CVG are alleged as background and as the source of the report on which Atlanta decision-makers later acted. Venue is proper in the Atlanta Division under Local Rule 3.1 because a substantial part of the events giving rise to the claims occurred in the Atlanta Division and Defendant maintains its corporate headquarters within the Atlanta Division.

6.

Plaintiff has satisfied all administrative prerequisites to suit under Title VII and the ADA. On or about August 21, 2025, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), Charge No. 410-2025-11264, alleging discrimination and retaliation based on disability, national origin, and religion. On August 6, 2026, the EEOC issued its Notice of Right to Sue and closed its processing of the charge. Plaintiff received the Notice the same day, August 6, 2026, through the EEOC Public Portal, after the EEOC notified her by email that a new document was available there. This Complaint is filed within ninety (90) days of Plaintiff's receipt of that Notice, as required by 42 U.S.C. § 2000e-5(f)(1) and 42 U.S.C. § 12117(a). A copy of the Notice of Right to Sue is attached as Exhibit 1, and a copy of the Charge of Discrimination is attached as Exhibit 2.

7.

Plaintiff's FMLA claims do not require administrative exhaustion and are timely under 29 U.S.C. § 2617(c), because this action is filed within two years of the last violation alleged, Plaintiff's termination on July 16, 2025.

## III. PARTIES

8.

Plaintiff Sanassa Diane ("Plaintiff") is an individual whose mailing address is 2870 Peachtree Rd NW #915-5642, Atlanta, Georgia 30305. At all times relevant to this Complaint, Plaintiff was an employee of Defendant Delta Air Lines, Inc. Plaintiff is of West African (Guinean) national origin and ancestry. Plaintiff's husband and children are Senegalese, and her family travels regularly to Senegal. Plaintiff is a practicing Muslim. She wore a hijab throughout her employment with Delta, and her religion was apparent to her managers and coworkers. Plaintiff has a disability as defined by the Americans with Disabilities Act, as amended by the ADA Amendments Act of 2008.

9.

Defendant Delta Air Lines, Inc. is a Delaware corporation with its principal place of business at 1030 Delta Boulevard, Atlanta, Georgia 30354. Delta is an international air carrier employing more than 500 employees and is an employer engaged in an industry affecting commerce within the meaning of 42 U.S.C. §

2000e(b), 42 U.S.C. § 12111(5)(A), and 29 U.S.C. § 2611(4)(A)(i). At all times relevant to this Complaint, Delta employed Plaintiff in various positions, most recently as Supply Chain Management Specialist (Grade 7) in its Technical Operations Division in Atlanta, Georgia.

## IV. FACTUAL ALLEGATIONS

### A. Plaintiff's Employment History and Performance

10.

Plaintiff began working for Delta on May 14, 2018, as confirmed by Plaintiff's IRS Wage and Income Transcripts for tax years 2018, 2019, and 2020, and by Delta's own employment verification service, Thomas and Company, which in November 2025 reported Plaintiff's Delta employment as running from May 14, 2018 to July 16, 2025. Defendant erroneously claimed in its EEOC Position Statement that Plaintiff began working for Delta in 2021, minimizing Plaintiff's seven-year tenure and history of strong performance.

11.

Throughout Plaintiff's seven years of employment, her performance record was consistently positive, and she was promoted four times. Her record includes the following:

(a) While assigned to the Cincinnati Reservations Center, Plaintiff ranked in the top 5% of call center agents and received a $4,000 Delta Vacations package in recognition of her performance.

(b) In or around 2019 to 2020, Plaintiff was promoted from the general reservations line to Elite Sales and Service Representative, serving Delta's highest-tier customers.

(c) In January 2023, Plaintiff was promoted through the Skills First Apprenticeship Program (Grade 5), for which she was selected from over 7,000 internal applicants, and Delta paid to relocate Plaintiff's family from Cincinnati, Ohio, to Atlanta, Georgia.

(d) In January 2024, Plaintiff was promoted to Senior Analyst, Corporate Sales Development (Grade 6).

(e) In October 2024, Plaintiff was promoted again to Supply Chain Management Specialist (Grade 7), the position she held at the time of her termination.

(f) In 2024, Delta selected Plaintiff to represent the company in national media, including The New York Times article "How a Diversity Initiative Changed Course With the Times" (January 22, 2024), which The Seattle Times republished with her photograph at Delta's Atlanta

headquarters (January 28, 2024), and a WorkingNation profile (March 22, 2024).

12.

Apart from minor attendance-related coaching early in her employment as an hourly reservations agent, Plaintiff was never disciplined in connection with her job performance. Delta promoted Plaintiff twice in 2024 and selected her for national media representation in the same year. The material change in Plaintiff's circumstances thereafter was her decision to take protected medical leave and to assert her rights under the ADA, FMLA, and Title VII.

**B. 2023 Pattern of National Origin Targeting at CVG**

13.

The events culminating in Plaintiff's termination did not arise suddenly. They followed a pattern of targeting at Cincinnati/Northern Kentucky International Airport ("CVG"), led by Operations Service Manager James McCubbins, which began in 2023 and focused on African passengers and Plaintiff's family in particular. The 2023 events described in this Section and in Section C are alleged as background evidence of discriminatory and retaliatory animus.

14.

On June 15, 2023, at McCubbins's direction, gate agent Wafa Braun denied Plaintiff's husband boarding based on the claim that TSA had flagged his bag for

lithium-ion batteries. Plaintiff's husband immediately contacted TSA. TSA personnel came in person that same day to Delta's Baggage Service Office at CVG and, with Plaintiff's husband and Delta leadership present, confirmed that the bags were "okay to fly" and left the standard TSA leaflet inside the bag. Braun later told Plaintiff that McCubbins had radioed her and directed her not to let Plaintiff's husband fly because he "fly's every other week," instructing her: "Just tell him that TSA says his bags can't fly." Delta documented the encounter in its own reservation notes, which confirm this sequence, stating that "Passengers bags were not boarded because items inside had the appearance of lithium batteries this was per gate su" [supervisor], and that the bag "was checked and examined by TSA and they confirmed they were not lithium batteries and had their leaflet in bag."

15.

In or around August to September 2023, Plaintiff's husband, Cheikh Ibrahima Sall, was traveling on Plaintiff's employee pass travel benefits on a domestic flight from CVG to New York's John F. Kennedy International Airport ("JFK"). The CVG-JFK flight is heavily used by African passengers, including the family members of Delta employees traveling on pass benefits, because JFK is a principal connecting point for flights to West Africa. Upon information and belief, before boarding began, McCubbins contacted U.S. Customs and Border Protection ("CBP") and requested immigration status checks on passengers. African

passengers, including Plaintiff's husband, were then approached and questioned by CBP about their legal status on a purely domestic leg of travel. CBP does not ordinarily conduct immigration status checks on purely domestic flights. Former Delta "Red Coat" Dominique Whyte has confirmed in a sworn affidavit dated December 1, 2025, that in the third quarter of 2023 she witnessed McCubbins contact CBP about passengers on a domestic CVG-JFK flight, after which African passengers, including Senegalese travelers, were questioned about their legal status and checked luggage.

16.

On or about August 28, 2023, McCubbins and CVG staff falsely reported that Plaintiff's husband "sells laptops" in Senegal using employee pass travel benefits. Plaintiff cooperated fully and provided documentation showing that the electronics were being used for charitable donations and family support in Senegal.

17.

On September 5, 2023, while the investigation into her husband's travel was still open, Plaintiff filed a formal HR complaint against McCubbins concerning his conduct, including the false lithium battery claim and his treatment of African passengers. This was protected activity under Title VII.

18.

On September 6, 2023, Delta informed Plaintiff that the investigation into her husband's travel was closed with "no further action," and Plaintiff's manager thanked her for her cooperation. In or around October 2023, Delta closed Plaintiff's complaint against McCubbins without taking any disciplinary action against him.

19.

The 2023 investigation concerned the same conduct for which Delta later terminated Plaintiff. In its EEOC Position Statement, Delta admits that on August 2, 2023, it "was made aware that Diane's husband was traveling with multiple laptops while using his non-revenue pass travel benefits"; that Plaintiff explained "the electronic devices were being transported to Africa and donated to an orphanage for charitable purposes" and provided a letter from the charity, Keur Xaleyi; and that Delta "did not substantiate a Pass Travel policy violation and, therefore, closed its investigation."

20.

Delta did not discipline Plaintiff in 2023. From that point forward, Delta knew that Plaintiff's husband transported large numbers of donated laptops to Senegal on pass travel for Keur Xaleyi, had reviewed and accepted Plaintiff's

documentation for that charity, and had found that this conduct did not violate its Pass Travel policy.

21.

On September 18, 2023, shortly after Plaintiff's complaint, Plaintiff missed a flight and was confronted by CVG "Red Coat" manager Linda Davenport. Rather than treating this as a routine missed flight, Davenport accused Plaintiff of violating Pass Travel policy by "checking bags without the intent to fly." During this interaction, Plaintiff told Davenport that she was aware of "how you all treat and view us Africans when we fly out of Cincinnati." Plaintiff immediately reported this to HR investigator Veronica Aikin, stating that she felt she was being treated differently because she had filed a complaint. Defendant's EEOC Position Statement omits this incident entirely.

**C. Company Knowledge: Failure to Address National Origin Harassment**

22.

In June 2025, Plaintiff reported that McCubbins used the term "DSS Crew" (a reference to the airport code for Dakar, Senegal) as a racialized nickname for African and Senegalese employees and travelers.

23.

Former Delta gate agent Ummul Niass, who is Senegalese, independently filed an HR complaint in late 2023 regarding McCubbins's use of the term "DSS crew." Niass and Plaintiff did not know each other at the time.

24.

Niass was told by Equal Opportunity Manager Leah Gajria that her complaint had been "investigated," but Niass observed no corrective action. McCubbins remained in leadership, and the behavior continued. Delta continues to label Plaintiff's complaint "unsubstantiated."

25.

Niass's affidavit, sworn under penalty of perjury on December 8, 2025, further documents a retaliatory change to her rehire eligibility. When Niass was separated on May 16, 2024, her separation letter stated that she would be eligible for rehire after seven years. For 293 days after her separation, Delta did not question that eligibility.

26.

On March 5, 2025, and March 9, 2025, Niass emailed Equal Opportunity Manager Leah Gajria and Delta senior leadership seeking to further appeal her termination and again raising national origin discrimination concerns.

27.

On March 12, 2025, seven days after Niass's March 5, 2025 email and three days after her March 9, 2025 email, CVG Station Manager Tammie Roberson, to whom McCubbins reports, issued a new letter stating that the original letter contained "incorrect information" and that Niass was "not eligible for rehire." After 293 days without change, Delta revoked Niass's rehire eligibility within one week of her renewed protected activity.

28.

Whyte's affidavit also describes uneven enforcement of carry-on and hand-bag rules toward African passengers at CVG. While working flights to Paris and JFK frequently used by African passengers connecting onward to West Africa, Whyte observed that when African passengers, including Senegalese travelers, had more than the allowed number of carry-on items, McCubbins strictly enforced Delta's policy, requiring them to consolidate items or denying them boarding. When non-African passengers, including White passengers, had the same number or more bags, the policy was not enforced.

**D. The February 11, 2025 Baggage Interception**

29.

On February 11, 2025, Plaintiff's husband checked his bags at Hartsfield-Jackson Atlanta International Airport ("ATL") for travel to CVG with their son,

Abdoulaye Sall, who held his own seat and ticket (the "February 11, 2025 Incident"). The bags were screened and cleared by TSA at ATL. Plaintiff's husband missed his original flight, and he and their son traveled to CVG on the next flight. The checked bags flew to CVG on the original flight. When Plaintiff's husband arrived at CVG, he went to Delta's Baggage Service Office to pick up his bags. There he found that Delta employees had already taken the bags from the carousel, identified them using the bag tag and employee standby tag, and opened them, and that airport police were present. The bags already contained TSA leaflets confirming screening.

30.

According to Delta's EEOC Position Statement, Delta's Corporate Security Department received a report on February 11, 2025 about Plaintiff's husband's bags, and Plaintiff's husband was questioned by CVG's Baggage Service Office. Upon information and belief, the February 11, 2025 report to Delta's Corporate Security Department originated with CVG personnel working under McCubbins's supervision or direction, and the Delta decision-makers who later suspended and terminated Plaintiff relied on that report without independently verifying it. McCubbins's documented history of hostility toward African passengers and toward Plaintiff's family is therefore relevant to the reliability of the report and to Defendant's motive.

31.

Under Delta's own stated policy, each passenger is limited to 15 personal electronic devices ("PEDs"). Two travelers were therefore permitted 30 PEDs combined. The actual total was 27 PEDs, within the numerical limit.

32.

According to Delta, the bags contained 22 laptops and five iPads. The devices were destined for the same charity, Keur Xaleyi, for the same charitable purpose that Delta had investigated and cleared in 2023 without finding any violation or disciplining Plaintiff.

33.

Instead of routing any concern through TSA or Delta's Dangerous Goods personnel, Delta staff contacted airport police, treating the situation as suspected criminal conduct rather than an internal policy or safety issue. The police report, obtained through an open records request, shows that police were called for "suspicious items" in a non-revenue bag, serial numbers were checked, and no items were found to be stolen. Delta raised safety and policy concerns only after the police found that nothing was stolen.

**E. The April 7, 2025 Investigation Interview**

34.

On April 7, 2025, Plaintiff participated in a Teams meeting with Employee Relations Manager and Investigator Bill Ittounas, General Manager Amanda ("Mandy") Smith, and Corporate Security Operations Manager Scott Rodine. The questioning focused not on concrete safety rules, but on: (a) what Plaintiff's husband does for a living; (b) the name of his employer; (c) his relationship with the person who picked him up; (d) the reasons for his last three trips to Senegal; (e) why he travels to Senegal often; (f) why he travels with checked baggage; and (g) where the laptops came from.

35.

None of these questions concerned a specific safety rule. They concerned Plaintiff's husband's livelihood and her family's travel to Senegal.

36.

During the April 7, 2025 meeting, which was recorded, Plaintiff stated that she was speculating about the purpose of her husband's trip and that she would need to confirm the details with him because she was not present. Defendant's representatives instructed Plaintiff to speak with her husband to verify the details and then to submit a written statement. After the meeting, Ms. Smith reminded Plaintiff that the written statement was due by the end of the day and told Plaintiff

that she could leave work early if she needed to go home to sort it out. Plaintiff left work early for that purpose. As instructed, Plaintiff spoke with her husband, obtained accurate details, and submitted a written statement clarifying that the devices were being given to a family member to transport to Keur Xaleyi, a children's charity in Senegal.

37.

Defendant now characterizes this clarification as "conflicting information." Plaintiff's initial comments were expressly identified as speculation, and the corrected details were provided after she consulted the person who was actually present, as Defendant's representatives had instructed her to do.

**F. FMLA/ADA Leave and Coercive Interference (April to May 2025)**

38.

At 12:16 p.m. on April 15, 2025, Plaintiff notified Ms. Smith by text message, and separately notified Manager Saige Rowe, that she would be on a medical leave of absence due to health-related issues and that she had contacted Sedgwick Claims Management Services, Inc. ("Sedgwick"), Delta's third-party leave administrator, which would be in touch regarding next steps. Ms. Smith acknowledged the message. Because Sedgwick administers extended leaves, Plaintiff's managers knew this was not a short-term absence.

39.

At 1:32 p.m. that same day, approximately seventy-five minutes after acknowledging Plaintiff's notice of medical leave, Ms. Smith emailed Plaintiff a work request: "Hey Sanassa, can you please forward the quote itself?"

40.

At 1:45 p.m. on April 15, 2025, Plaintiff wrote to Ms. Rowe that she was "not in a place to talk about details right now," that she had "already been in touch with Sedgwick and followed the necessary steps," and that Sedgwick would "be reaching out to you for anything further."

41.

The next morning, April 16, 2025, despite that instruction, Plaintiff's managers contacted her four times in approximately one hour: Ms. Rowe texted at 9:18 a.m. and called at 10:11 a.m., and Ms. Smith called at 10:14 a.m. and again at 10:15 a.m.

42.

At 12:24 p.m. that day, Ms. Smith texted Plaintiff: "Heard from Sedgwick that they are waiting to hear back from you. It is imperative you do this today because if there's a chance leave is not approved then the absences would be unexcused which is a complication we don't want to create." Ms. Smith added: "Please confirm with me once you've reached back out to Sedgwick."

43.

Ms. Smith's demand for same-day action misstated Plaintiff's obligations. Sedgwick's April 14, 2025 notice to Plaintiff stated that her claims specialist would contact her healthcare provider directly to collect the medical documentation, that Sedgwick would notify her within 15 days if the documentation had not been received, and that the information was needed within 21 days. The notice asked Plaintiff to report her FMLA-related absence to her supervisor, which she did on April 15, 2025, and to follow up with her provider's office. It set no same-day deadline. Sedgwick's April 17, 2025 letter confirmed that it had requested the information from Plaintiff's physician and would follow up if it was not received by April 28, 2025. Nothing in Sedgwick's communications required Plaintiff to act on April 16, 2025.

44.

Ms. Smith's same-day demand and her warning that Plaintiff's absences "would be unexcused" came after Plaintiff had asked her managers to direct their questions to Sedgwick.

45.

On or about April 22, 2025, Sedgwick approved Plaintiff's medical leave from April 15, 2025, through May 26, 2025. Plaintiff later requested an extension, which Sedgwick approved through August 26, 2025.

46.

Plaintiff's treating psychiatrist, Dr. Sarah Debrey, MD, diagnosed Plaintiff with Major Depressive Disorder, Generalized Anxiety Disorder, and Post-Traumatic Stress Disorder. On May 21, 2025, Dr. Debrey documented that Plaintiff's medical leave was medically necessary and that returning to work on May 26, 2025 "is not currently an option," and recommended that Plaintiff extend her leave through August 2025.

47.

While Plaintiff was on approved medical leave, Ms. Smith took additional adverse actions:

(a) Before her leave, Plaintiff and Ms. Smith co-organized Delta's participation in the Air Carriers Purchasing Conference ("ACPC"), an annual airline industry purchasing conference, and Plaintiff was listed as an organizer on the ACPC meeting invitation. On May 8, 2025, Ms. Smith sent a new meeting invitation to the team for the ACPC project, retitled "Mandy at ACPC," removing Plaintiff's role in the project she had co-organized. On May 14, 2025, twelve days before Plaintiff's then-scheduled return date of May 26, 2025, Ms. Smith declined Plaintiff's original ACPC meeting invitation. This removal occurred

before any determination that Plaintiff would be unable to return on her initial return date.

(b) On May 29, 2025, Plaintiff and Sedgwick notified Defendant that Plaintiff's leave had been extended through August 26, 2025. Shortly afterward, at 1:11 p.m., Ms. Smith texted Plaintiff asking her to call because she had "a quick update to share." Plaintiff called at 1:16 p.m. During that recorded call (the "May 29, 2025 Call"), Ms. Smith told Plaintiff that her previously imposed three-month pass travel suspension, scheduled to expire on June 5, 2025, would not be lifted: "we won't be reinstating it while you're on leave… we're going to wait until you return." Ms. Smith explained: "Out of respect for your leave, we're not going to follow up with you while you're out." This violated Delta's own policy, which provides that employees on approved leave maintain the same travel privileges as active employees. Conditioning restoration of the benefit on Plaintiff's return from protected leave penalized her for taking that leave.

(c) Plaintiff responded that the decision did relate to her leave, explaining that "from what I know of Delta's protocol they have continued investigations communication with other employees on leave in the past," and asked Ms. Smith to send the decision to her in writing. Ms.

Smith replied: "are you saying that you would like to have the investigation meetings while you're on leave? Because that's something I'm prohibited from doing." Plaintiff answered: "Yes. If something involving my employment or pass travel benefits and that's something I'm entitled to regardless if I'm on medical leave or not and it's being stopped because of my leave extension, then yes, I would like to have that call."

(d) Plaintiff's answer was expressly conditioned on Defendant withholding her pass travel benefit because of her leave. It was not a request to be investigated, suspended, or disciplined. Ms. Smith's statement that she was "prohibited" from holding investigation meetings during leave is also contradicted by Defendant's investigation and discipline of Dominique Whyte while Whyte was on leave, described below. Ms. Smith never sent Plaintiff the decision in writing. Plaintiff instead put her objection in writing herself in the June 2, 2025 Complaint, described below, which she addressed to Ms. Smith.

48.

Following the May 29, 2025 Call, Plaintiff's symptoms worsened significantly. Dr. Debrey's records from June 13, 2025, document that Plaintiff

reported her manager had told her that her travel privileges would remain suspended while she was on FMLA leave, which caused Plaintiff to feel she was "being punished for prioritizing her health."

**G. Protected Activity and Retaliatory Response (June 2025)**

49.

On June 2, 2025, Plaintiff emailed Ms. Smith, copying HR Director Mindy Davison, HR Manager Jennith Poferl, Ms. Rowe, and senior Delta leaders including Allison Ausband, John Laughter, and Peter Carter (the "June 2, 2025 Complaint"). Plaintiff wrote that Ms. Smith's handling of her FMLA and short-term disability leave had felt "retaliatory, inappropriate and at times coercive"; that extending her suspension to match her medical leave "feels coercive & punitive"; that the pressure to return before she was medically ready "feels like you are interfering with my right to take FMLA/ STD"; and that she was "genuinely concerned that you may retaliate against me when I return." The same day, Plaintiff submitted the same complaint through Delta's Ethics and Compliance Helpline.

50.

In the June 2, 2025 Complaint, Plaintiff also asked that Vice President Ken McCue and HR Manager Jennith Poferl, both of whom she identified as close to Ms. Smith, be excluded from any role in investigating or resolving her concerns.

51.

On June 5, 2025, Plaintiff filed an internal ethics complaint alleging discrimination, harassment, and retaliation based on national origin, including McCubbins's "DSS Crew" remarks (the "June 5, 2025 Ethics Complaint").

52.

On June 10, 2025, Employee Relations Manager Danielle Bourne spoke with Plaintiff regarding her complaints. Plaintiff explained that the extension of her pass travel suspension was retaliation for taking disability-related leave and that she was being retaliated against for raising concerns.

53.

On June 20, 2025, Ms. Bourne and Employee Relations Manager Chris Chadzutko met with Plaintiff and closed her complaints with a single-sentence conclusion that no inappropriate behavior or job-related concerns were found. No follow-up questions, document requests, or witness interviews were conducted with Plaintiff. In the same meeting, Ms. Bourne told Plaintiff that Ittounas had not followed up on the pass travel investigation out of respect for her medical leave, and that Ms. Bourne had "now informed Bill to follow up with me sometime next week regarding the outcome of that investigation." Plaintiff confirmed these statements in a written recap sent to Ms. Bourne and Mr. Chadzutko that day. Neither disputed it.

54.

On June 23, 2025, through Delta's ethics portal, and again on June 24, 2025, by email to Mr. Chadzutko and Ms. Bourne, Plaintiff asked Delta to follow its own complaint-handling procedures and formally close her complaints. Within 48 hours of her June 24, 2025 email, Plaintiff was suspended, her access was removed, and the termination review began.

55.

The investigation into the February 11, 2025 Incident had been inactive for approximately 81 days. Defendant gave contradictory explanations for that delay: Ms. Smith and Ms. Bourne told Plaintiff the matter was paused out of respect for her leave, while Defendant told the EEOC the investigation was "ongoing."

56.

The investigation was revived and concluded only after the June 2, 2025 Complaint and the June 5, 2025 Ethics Complaint. Within 24 days of Plaintiff's June 2, 2025 complaint, and 21 days of her June 5, 2025 complaint: (a) Plaintiff's internal complaints were closed on June 20, 2025; (b) Plaintiff requested formal closure of her complaints on June 23 and 24, 2025; and (c) Plaintiff was suspended and her access removed on June 26 and 27, 2025.

**H. ADA Accommodation Request (June 2025)**

57.

On June 22, 2025, Plaintiff requested a reasonable accommodation under the ADA: that communications regarding the investigation be conducted in writing because of her medical condition (the "Accommodation Request"). The request was supported by Plaintiff's treating physician and was formally assigned to Accommodations Specialist Henrietta Archie.

58.

Investigator Ittounas initially sent Plaintiff a Microsoft Teams meeting invitation. Plaintiff reminded him that her Accommodation Request for written communication was pending and asked that his questions be sent to her by email. Ittounas canceled the meeting and instead sent Plaintiff 18 written questions with a short deadline. Plaintiff answered all 18 questions in writing in under four hours.

59.

During the April 7, 2025 meeting and in follow-up emails, Ittounas had answered Plaintiff's questions, including by confirming in writing that Delta has no policy that differentiates between non-revenue and revenue luggage. After Plaintiff made the Accommodation Request, however, Ittounas refused to answer her six written clarifying questions, stating that he was "unable to share the information you requested." The questions he declined to answer included why

Delta had waited more than two months to follow up and did so only after her complaints, and whether Delta's policy prohibits engaging an employee who is on protected leave.

60.

On June 25, 2025, Ms. Smith texted Plaintiff to schedule a Microsoft Teams call for 8:00 a.m. the next day. Plaintiff replied that she had a pending ADA accommodation request, supported by her doctor, for written communication, that Henrietta Archie was assigned to it, and asked that any updates be sent in writing. Ms. Smith agreed.

61.

Plaintiff informed Defendant in writing that her request to limit communication to writing was based on medical advice, that it was a health-based necessity and not a refusal to cooperate, and that characterizing her accommodation as non-cooperation would violate her ADA rights. Defendant's Position Statement now asserts that Plaintiff declined a call and omits this communication.

62.

Ms. Smith later wrote to Plaintiff describing the investigation's findings and stated: "Because of your refusal to speak with me or others in the company by phone, we were unable to share the above additional information with you."

Defendant thus characterized Plaintiff's accommodation as a "refusal" and withheld information about the findings against her because she communicated in writing.

**I. Notice of Religious Practice (June 2025)**

63.

On June 22, 2025, Plaintiff notified Ittounas in writing that the electronic devices at issue were connected to her sincerely held religious beliefs as a practicing Muslim, specifically her family's fulfillment of Zakat and Sadaqa, which are core obligations in Islam. Plaintiff wrote: "Some of the concerns under review relate directly to my sincerely held religious beliefs as a practicing Muslim… Charity, or zakat, is one of the Five Pillars of Islam. My husband and I practice this regularly… and giving is a duty." Plaintiff also submitted a religious accommodation request (together, the "Religious Notice").

64.

Defendant did not acknowledge the religious basis, request clarification, discuss any accommodation with Plaintiff, explore any alternative method by which Plaintiff's family could transport charitable goods, or assess whether any accommodation would impose an undue hardship. Instead, Defendant suspended and then terminated Plaintiff's employment.

**J. Retaliatory Suspension and Termination (June to July 2025)**

65.

On June 26, 2025, Ittounas notified Plaintiff that the investigation was complete. Later that day, Ms. Smith emailed Plaintiff, writing, "As you requested, I am reaching out in writing," that Employee Relations had "substantiated a violation of Delta policy" and "determined that you were dishonest and not forthcoming," and that Plaintiff was suspended pending review for continued employment. Plaintiff was invited to provide a statement.

66.

Contrary to Defendant's claim that Plaintiff did not submit a statement, on July 1, 2025, Plaintiff sent a detailed written statement (the "July 1, 2025 Statement") to Ms. Smith, Vice President Ken McCue, and HR Manager Jennith Poferl. The statement: (a) refuted Defendant's claim that Keur Xaleyi is an "electronics store" by providing multiple independent sources confirming its nonprofit status; (b) explained that battery removal could not be determined by visual inspection; (c) reiterated that the batteries had been removed; and (d) reaffirmed the religious basis for the donations.

67.

Defendant proceeded with termination after receiving this statement, with the knowledge of Vice President McCue.

68.

Defendant's own communications identify the people responsible for the suspension and termination. Ittounas conducted the investigation and told Plaintiff on June 26, 2025 that it was complete. Ms. Smith communicated the suspension that day, citing Employee Relations' findings, and communicated the termination on July 16, 2025, copying Vice President McCue and HR Manager Poferl. Upon information and belief, Ittounas and Employee Relations made the findings and recommendations on which both decisions rested, and Ms. Smith communicated those decisions with the knowledge of Vice President McCue and HR Manager Poferl. When they acted, Ms. Smith knew of Plaintiff's medical leave, the June 2, 2025 Complaint, which was addressed to her, and the Accommodation Request; Ittounas knew of the Accommodation Request and the Religious Notice; and Vice President McCue had received the July 1, 2025 Statement, which reaffirmed the religious basis for the donations.

69.

On July 16, 2025, while Plaintiff remained on approved medical leave, Defendant notified Plaintiff that her employment was terminated and offered her the opportunity to resign in lieu of termination. Defendant's stated reason was a "policy violation" relating to her husband's pass travel on February 11, 2025. Ms. Smith sent the termination notice with copies to Vice President McCue and HR

Manager Poferl, the two individuals Plaintiff had asked in the June 2, 2025 Complaint to be excluded from any role in resolving her concerns.

70.

Defendant asserts that Plaintiff did not appeal the termination. Plaintiff did not appeal internally because: (a) Defendant had dismissed her detailed seven-page complaint in a single sentence; (b) Defendant had repeatedly disregarded the evidence she submitted; (c) Defendant had retaliated against others who challenged discrimination, such as Ummul Niass, whose rehire status was reversed after she raised concerns; and (d) Plaintiff was suspended within 48 hours of requesting procedural compliance on June 24, 2025. No internal appeal is a prerequisite to the claims asserted here.

**K. Defendant's Shifting and Unsupported Explanations**

71.

The conduct at issue in 2025 was the same conduct Delta reviewed in 2023. In 2023, Delta investigated Plaintiff's husband for transporting multiple laptops to Africa for charity, accepted her charity documentation, found no violation, and imposed no discipline. In 2025, after Plaintiff took protected medical leave and filed the June 2, 2025 Complaint and the June 5, 2025 Ethics Complaint, Delta treated the same conduct as grounds to terminate her employment and reversed its earlier acceptance of the same charity, Keur Xaleyi, by calling it an "electronics

store." In explaining the suspension, Ms. Smith relied on the earlier investigation, writing: "This is not the first instance or investigation into the transportation of electronics or other pass travel violations by your pass travelers."

72.

Defendant's own managers did not treat the February 11, 2025 Incident as urgent or as grounds for termination. Ms. Smith and Ms. Bourne told Plaintiff that the investigation was paused out of respect for her leave and would be concluded when she returned. When Ms. Smith said this on May 29, 2025, Defendant already knew that Plaintiff's leave had been extended through August 26, 2025. Defendant was therefore prepared to leave the matter open until at least late August 2025, more than six months after the February 11, 2025 Incident. Had Defendant believed Plaintiff's conduct warranted termination, it would have pursued the investigation during her leave, as it did with Whyte. Instead, the investigation moved forward only after the June 2, 2025 Complaint and the June 5, 2025 Ethics Complaint, and in a recorded call Ms. Bourne attributed its resumption to Plaintiff's insistence on finalizing it. Plaintiff's protected complaints, not any independent concern about her conduct, set her termination in motion.

73.

Defendant's explanations for withholding Plaintiff's pass travel also shifted. On May 29, 2025, Ms. Smith tied the decision to Plaintiff's leave, telling her

Defendant would "wait until you return" out of "respect for your leave." On June 7, 2025, after the June 2, 2025 Complaint, HR Director Mindy Davison instead wrote that the suspension had been extended "due to the seriousness of the current pass travel violation investigation." Yet Defendant had left that investigation untouched for nearly two months. An investigation Defendant described as serious enough to extend Plaintiff's suspension was not one Defendant chose to pursue until Plaintiff complained.

74.

Delta did not treat the February 11, 2025 Incident as a safety matter. A carrier that discovers undeclared hazardous materials must file a DOT Form F 5800.1 report within 30 days. 49 C.F.R. § 171.16(a)(4). The U.S. Department of Transportation's public hazardous materials incident database contains no report by Delta for the February 11, 2025 Incident. Delta confiscated no items and released the luggage to Plaintiff's husband and son. Upon information and belief, Delta also involved no Dangerous Goods personnel and made no TSA or FAA notification. Instead, it called airport police to investigate suspected theft.

75.

Delta has treated other lithium battery discoveries as Dangerous Goods incidents. In January 2018, a single laptop battery at CVG resulted in a DOT Form 5800.1 report. In July 2023, lithium batteries in cell phones discovered at ATL

were photographed, escalated, and investigated as undeclared Dangerous Goods. Delta did not follow that practice on February 11, 2025.

76.

Ittounas confirmed to Plaintiff in writing after the April 7, 2025 meeting that "Delta does not have a policy that differentiates between non-rev and revenue luggage." Defendant therefore cannot explain its departure from its usual practice on the ground that the bags belonged to a pass rider.

77.

Defendant also told the EEOC that Keur Xaleyi was "not a charity" but an "electronics store that sold electronic devices for profit." Defendant provided no address, business registration, record, or other evidence of commercial activity, sales, or profit. Keur Xaleyi is a documented nonprofit children's organization in Senegal; its name means "House of Children" in Wolof, and it is referenced by independent organizations including the Van Leer Foundation, the United Nations Child Rights Library, Archnet, Pandion Europe, and the International Observatory of Mayors. Delta had accepted Plaintiff's documentation for this same charity when it closed its 2023 investigation without finding a violation.

78.

Defendant further alleged to the EEOC that in 2024 Plaintiff "scream[ed]" at gate agents and blocked a counter. Defendant provided no date, airport, witness,

documentation, investigation report, or discipline for this alleged incident, although every other event in its Position Statement includes a date. The incident did not occur. In the same year, Delta promoted Plaintiff twice and selected her to represent the company in national media.

**L. Comparator Evidence and Pattern of Conduct**

79.

The treatment of other employees is alleged for limited purposes: Whyte's, to show that Defendant investigated and disciplined an employee during protected leave; Niass's, to show retaliatory animus among CVG management; and Dreisbach's, to show Ms. Smith's response to an employee's disclosure of a medical condition.

80.

Defendant's explanation that it paused Plaintiff's investigation out of respect for her leave is contradicted by its treatment of Dominique Whyte. In spring 2025, Ittounas investigated an alleged pass travel violation involving one of Whyte's companion pass riders, just as Plaintiff's case involved her husband as her pass rider. Whyte was on approved, protected medical leave and had traveled to Ghana using her pass travel benefits. On March 10, 2025, McCubbins emailed Whyte, with Roberson included, asking her to contact them "as soon as possible" about "an urgent matter" and stating: "If you're out of the country please let us know

when a good time would be to speak to you via telephone." When Whyte did not respond, Delta revoked her pass travel benefits while she was in Ghana. Upon information and belief, Delta did so to compel her to respond. As Delta's own April 1, 2025 email acknowledged, Whyte had told Delta's pass travel center that she was "stuck in Ghana because of your pass travel privileges being revoked." Stranded abroad without her travel benefits, Whyte had no practical choice but to engage with Delta's investigation during her leave. On April 1, 2025, Roberson, copying Ittounas, emailed Whyte asking for "dates/times that we can speak with you regarding an important matter regarding your pass travel privileges," and scheduled a Microsoft Teams interview for April 3, 2025. Delta interviewed Whyte on April 3, 2025, while she remained on leave, and on April 15, 2025, twelve days later, disciplined her while she was still on leave.

81.

Delta, through McCubbins, Roberson, and Ittounas, thus initiated contact with an employee on leave, cut off her travel benefits when she did not respond, and scheduled an investigatory interview with her during her leave. These are the very steps Ms. Smith told Plaintiff that Delta was "prohibited" from taking.

82.

Defendant has otherwise completed pass travel investigations quickly. The 2023 investigation into Plaintiff's husband's travel closed on September 6, 2023,

nine days after the August 28, 2023 report. Whyte's 2025 investigation concluded on April 15, 2025, fourteen days after Delta's April 1, 2025 email scheduling her interview. Plaintiff's investigation, by contrast, sat idle for approximately 81 days and was revived only after her June 2, 2025 and June 5, 2025 complaints.

83.

Ms. Smith, a key decision-maker in Plaintiff's case, has acted adversely against another employee who disclosed a medical condition. Former employee Michele Dreisbach reported directly to Ms. Smith. Based on Dreisbach's own account to Plaintiff, in June 2024, Dreisbach told Ms. Smith that she had been diagnosed with sleep apnea and attention deficit disorder and would be starting treatment. Within approximately two days of starting treatment, Ms. Smith placed her on a Performance Improvement Plan. When Dreisbach asked whether improving in the areas identified would lead to her removal from the plan, Ms. Smith said it would not. Dreisbach escalated the matter to HR Director Mindy Davison, telling her that her conditions were a disability and that Ms. Smith's treatment of her was illegal. Within approximately one week, she was offered severance in lieu of termination in July 2024. Ms. Smith described Dreisbach's departure as a retirement. Plaintiff was later promoted into Dreisbach's former position.

**M. Damages**

84.

As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered substantial damages, including but not limited to:

(a) Lost wages and employment benefits from her termination on July 16, 2025, until she obtained replacement employment, based on her Delta compensation of approximately $86,712 per year ($7,226 per month);

(b) Continuing lost earnings since obtaining replacement employment, measured by the difference between her Delta compensation and her current salary of approximately $70,000 per year, or approximately $16,712 per year, together with the value of lost benefits, including health insurance, retirement contributions, and pass travel privileges;

(c) Severe emotional distress, anxiety, depression, and significant worsening of her medical conditions following Defendant's coercive communications and retaliatory actions;

(d) Medical expenses for psychiatric treatment, including medication and ongoing care;

(e) Lost profit sharing, including Delta's profit-sharing payment for 2025, which Delta paid to eligible employees in February 2026 at approximately 9% of eligible annual earnings;

(f) Loss of professional reputation and of a long-term career at Delta. Plaintiff was 29 years old when Defendant terminated her, had been promoted four times, and planned to build her career at Delta through retirement;

(g) Costs, and attorney's fees if Plaintiff retains counsel, as permitted by law; and

(h) Such other damages as the Court deems just and proper.

## V. CLAIMS FOR RELIEF

### COUNT I

### TITLE VII: NATIONAL ORIGIN DISCRIMINATION (42 U.S.C. § 2000e-2(a))

85.

Plaintiff incorporates by reference paragraphs 1 through 9 and the allegations of Sections A, B, C, D, E, J, K, L, and M of the Factual Allegations (paragraphs 10 through 37, 65 through 84) as if fully set forth herein.

86.

Plaintiff is a member of a protected class based on her West African (Guinean) national origin and ancestry. Title VII also protects Plaintiff from discrimination because of her association with her Senegalese husband and

children and because of Defendant's perception of her and her family as African and Senegalese, including as part of the so-called "DSS Crew."

87.

Plaintiff was qualified for her position, as shown by her seven-year tenure, high performance, consecutive promotions to Grade 7, and selection to represent Delta in national media.

88.

Plaintiff suffered adverse employment actions, including: (a) the extension of her pass travel suspension; (b) suspension of her employment on June 26, 2025; and (c) termination of her employment on July 16, 2025.

89.

The investigation that led to these actions originated with the February 11, 2025 Incident at CVG, where Operations Service Manager James McCubbins had engaged in a documented pattern of national origin hostility, including: (a) referring to African/Senegalese employees and travelers as the "DSS Crew"; (b) contacting CBP to conduct immigration status checks of African passengers on domestic flights; (c) enforcing baggage policies against African passengers while not enforcing them against non-African passengers; and (d) asserting false safety violations to deny boarding to Plaintiff's husband. Upon information and belief, the decision-makers relied on the report generated at CVG without independently

verifying it, and the investigation itself focused on Plaintiff's family's travel to Senegal and national origin.

90.

Defendant was on notice of this conduct through Plaintiff's complaints of September 5, 2023, and June 5, 2025, and through Ummul Niass's independent complaint, yet took no corrective action.

91.

Defendant's stated reasons for its actions are pretextual, as shown by: (a) its contradictory explanations to Plaintiff and to the EEOC for the 81-day delay; (b) its failure to treat the February 11, 2025 Incident as a Dangerous Goods incident, contrary to its stated safety rationale; (c) its release of the luggage it now claims posed a safety risk; (d) its unsupported allegation of a 2024 boarding-gate incident; (e) its unsupported characterization of Keur Xaleyi as an "electronics store"; and (f) its termination of Plaintiff for the same type of charitable transport it had investigated and cleared in 2023.

92.

Plaintiff's national origin was a motivating factor in, and a but-for cause of, Defendant's adverse actions.

93.

As a direct and proximate result of Defendant's national origin discrimination, Plaintiff has suffered the damages described in Paragraph 84 above.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant Delta Air Lines, Inc., and grant the relief set forth in the Prayer for Relief.

**COUNT II**

**TITLE VII: RELIGIOUS DISCRIMINATION (FAILURE TO ACCOMMODATE) (42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 2000e(j))**

94.

Plaintiff incorporates by reference paragraphs 1 through 9 and the allegations of Sections A, D, E, I, J, K, and M of the Factual Allegations (paragraphs 10 through 12, 29 through 37, 63 through 78, 84) as if fully set forth herein.

95.

Plaintiff is a practicing Muslim who wears a hijab, and Defendant's managers knew her religion. Her sincerely held religious beliefs include the obligations of Zakat and Sadaqa, which are obligatory and voluntary charitable giving. The electronic devices at issue in Defendant's investigation were being

transported to Senegal as part of Plaintiff's and her husband's fulfillment of these religious obligations. Defendant had known of the charitable purpose since its 2023 investigation, and Plaintiff reminded Defendant of it during the April 7, 2025 meeting and again during her suspension.

96.

On June 22, 2025, Plaintiff notified Defendant in writing that the conduct under investigation was connected to her sincerely held religious beliefs and submitted a religious accommodation request.

97.

Plaintiff's religious practice conflicted with Defendant's pass travel requirements as Defendant applied them, because Defendant treated her family's transport of donated devices for Zakat and Sadaqa as a policy violation and disciplined her for it.

98.

Title VII required Defendant to reasonably accommodate Plaintiff's religious practice unless doing so would impose an undue hardship, meaning a burden that is substantial in the overall context of Defendant's business. Groff v. DeJoy, 600 U.S. 447 (2023).

99.

Defendant did not acknowledge Plaintiff's religious practice, discuss any accommodation with her, consider any alternative, such as guidance, documentation requirements, or conditions on future charitable transport, or assess whether any accommodation would impose an undue hardship.

100.

Accommodating Plaintiff's religious practice would not have imposed an undue hardship on Defendant's business. Defendant had permitted the same charitable transport after its 2023 review without finding any violation, and the devices transported on February 11, 2025 were within Delta's per-passenger device limit. Defendant could have addressed any concern through guidance, documentation requirements, or conditions on future transport rather than termination.

101.

Instead, Defendant suspended Plaintiff four days after her religious accommodation request and terminated her employment, and Plaintiff's religious practice and need for accommodation were a motivating factor in those decisions.

102.

As a direct and proximate result, Plaintiff has suffered the damages described in Paragraph 84 above.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant Delta Air Lines, Inc., and grant the relief set forth in the Prayer for Relief.

## COUNT III

## TITLE VII: RETALIATION (42 U.S.C. § 2000e-3(a))

103.

Plaintiff incorporates by reference paragraphs 1 through 9 and the allegations of Sections A, B, C, G, I, J, K, L, and M of the Factual Allegations (paragraphs 10 through 28, 49 through 56, 63 through 84) as if fully set forth herein.

104.

Plaintiff engaged in protected activity under Title VII, including:

(a) On June 5, 2025, filing an internal ethics complaint of national origin discrimination, harassment, and retaliation, including McCubbins's "DSS Crew" remarks;

(b) On June 22, 2025, notifying Defendant of her religious practice and requesting religious accommodation; and

(c) On July 1, 2025, submitting the July 1, 2025 Statement to Vice President Ken McCue and others, challenging the basis for her suspension and reaffirming the religious basis for the donations.

105.

Plaintiff's earlier complaints in September 2023 against McCubbins and Davenport are further evidence of Defendant's knowledge and retaliatory animus.

106.

Defendant's decision-makers, including Ms. Smith, Ittounas, Ms. Bourne, and Vice President McCue, knew of Plaintiff's protected activity.

107.

Defendant took materially adverse actions against Plaintiff after her protected activity, including: (a) on June 20, 2025, closing her complaints without a substantive investigation; (b) reviving the dormant investigation; (c) on June 26, 2025, suspending her employment and removing her access, 21 days after her June 5, 2025 complaint and four days after her June 22, 2025 request; and (d) on July 16, 2025, terminating her employment.

108.

The close temporal proximity between Plaintiff's protected activity and Defendant's adverse actions, together with the revival of an investigation that had been idle for approximately 81 days only after her complaints, establishes causation.

109.

Defendant's stated reasons are pretextual, as shown by its contradictory explanations, its departure from its own Dangerous Goods practice, its treatment of Whyte, its unsupported 2024 allegation, its unsupported characterization of Keur Xaleyi, and its termination of Plaintiff for the same type of charitable transport it had cleared in 2023.

110.

Plaintiff would not have been suspended and terminated but for her protected activity under Title VII.

111.

As a direct and proximate result, Plaintiff has suffered the damages described in Paragraph 84 above.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant Delta Air Lines, Inc., and grant the relief set forth in the Prayer for Relief.

**COUNT IV**

**ADA: FAILURE TO ACCOMMODATE (42 U.S.C. § 12112(b)(5)(A))**

112.

Plaintiff incorporates by reference paragraphs 1 through 9 and the allegations of Sections A, F, H, J, and M of the Factual Allegations (paragraphs 10

through 12, 38 through 48, 57 through 62, 65 through 70, 84) as if fully set forth herein.

113.

Plaintiff has a disability within the meaning of 42 U.S.C. § 12102. Her diagnosed conditions, including Major Depressive Disorder, Generalized Anxiety Disorder, and Post-Traumatic Stress Disorder, substantially limit major life activities including concentrating, thinking, sleeping, communicating, and working, as well as brain and neurological function.

114.

Plaintiff is a qualified individual under 42 U.S.C. § 12111(8). She had performed the essential functions of her Grade 7 position successfully since her promotion in October 2024. Her medical leave was finite: Sedgwick approved it through August 26, 2025, on her psychiatrist's certification, and Plaintiff expected to return on that date. With reasonable accommodation, including that approved leave and written communication, she could perform the essential functions of her position.

115.

On June 22, 2025, Plaintiff requested a reasonable accommodation, namely written rather than verbal communication about the investigation, supported by her

treating physician. Defendant knew of the request, which was assigned to Accommodations Specialist Henrietta Archie.

116.

Defendant was required to make reasonable accommodations to Plaintiff's known limitations and to engage in an interactive process to identify them. 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.2(o)(3).

117.

Defendant failed to reasonably accommodate Plaintiff and failed to engage in the interactive process, including by: (a) through Ittounas, refusing to answer Plaintiff's written clarifying questions after she made the Accommodation Request, although he had answered her questions before it; (b) characterizing Plaintiff's written-communication accommodation as a "refusal to speak with me or others in the company by phone"; and (c) withholding information about the findings against her because she communicated in writing. The accommodation Plaintiff requested required Defendant to communicate with her in writing, including by answering her written questions, not merely to send her written notices. As a result, Plaintiff was denied information she needed to respond to the findings against her while Defendant moved to terminate her.

118.

As a direct and proximate result, Plaintiff has suffered the damages described in Paragraph 84 above.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant Delta Air Lines, Inc., and grant the relief set forth in the Prayer for Relief.

## COUNT V

## ADA: DISABILITY DISCRIMINATION (42 U.S.C. § 12112(a))

119.

Plaintiff incorporates by reference paragraphs 1 through 9 and the allegations of Sections A, F, G, H, J, K, L, and M of the Factual Allegations (paragraphs 10 through 12, 38 through 62, 65 through 84) as if fully set forth herein.

120.

Plaintiff has a disability within the meaning of 42 U.S.C. § 12102 and is a qualified individual under 42 U.S.C. § 12111(8), as alleged above.

121.

Defendant knew of Plaintiff's disability through her approved medical leave, her treating psychiatrist's certification, and her Accommodation Request.

122.

Defendant suspended Plaintiff on June 26, 2025, and terminated her on July 16, 2025, while she was on approved disability-related leave, because of her disability and her need for medical leave and accommodation.

123.

Ms. Smith, a key decision-maker in both actions, previously placed another employee on a Performance Improvement Plan within days after that employee disclosed medical diagnoses and began treatment, as alleged above.

124.

Defendant's stated reasons for suspending and terminating Plaintiff are pretextual, as shown by: (a) Defendant told Plaintiff the investigation was paused out of respect for her disability-related leave, then treated the same conduct as grounds for termination; (b) Defendant first tied the withholding of her pass travel to her leave and later attributed it to the "seriousness" of an investigation it had left untouched; (c) Defendant departed from its own Dangerous Goods practice for the February 11, 2025 Incident; (d) Defendant had investigated and cleared the same type of charitable transport in 2023; and (e) Ms. Smith's treatment of Michele Dreisbach after Dreisbach disclosed medical diagnoses.

125.

As a direct and proximate result, Plaintiff has suffered the damages described in Paragraph 84 above.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant Delta Air Lines, Inc., and grant the relief set forth in the Prayer for Relief.

**COUNT VI**

**ADA: RETALIATION (42 U.S.C. § 12203(a))**

126.

Plaintiff incorporates by reference paragraphs 1 through 9 and the allegations of Sections A, F, G, H, J, K, L, and M of the Factual Allegations (paragraphs 10 through 12, 38 through 62, 65 through 84) as if fully set forth herein.

127.

Plaintiff engaged in protected activity under the ADA by: (a) taking disability-related medical leave beginning April 15, 2025; (b) opposing, in the June 2, 2025 Complaint and the identical Ethics and Compliance Helpline complaint she filed the same day, Ms. Smith's retaliatory and coercive treatment of her during that leave; (c) complaining on June 10, 2025, that the extension of her pass travel suspension was retaliation for her disability-related leave; (d) requesting a

reasonable accommodation in writing on June 22, 2025; and (e) informing Defendant that treating her accommodation as non-cooperation would violate her ADA rights.

128.

Defendant knew of this protected activity. The accommodation request was assigned to Accommodations Specialist Henrietta Archie and communicated to Ittounas, Ms. Smith, and other decision-makers.

129.

Defendant took materially adverse actions against Plaintiff because of her protected activity, including: (a) suspending her employment and removing her access on June 26, 2025, four days after her accommodation request; and (b) terminating her employment on July 16, 2025.

130.

The close temporal proximity between Plaintiff's June 22, 2025 accommodation request and her June 26, 2025 suspension establishes causation. Defendant's stated reasons are pretextual, as shown by: (a) Defendant resumed the investigation only after the June 2, 2025 Complaint, having told Plaintiff it was paused out of respect for her leave; (b) after that complaint, Defendant shifted its explanation for withholding her pass travel from her leave to the "seriousness" of the investigation; (c) Defendant departed from its own Dangerous Goods practice

for the February 11, 2025 Incident; and (d) Defendant had investigated and cleared the same type of charitable transport in 2023.

131.

Plaintiff would not have been suspended and terminated but for her protected activity under the ADA.

132.

As a direct and proximate result, Plaintiff has suffered the damages described in Paragraph 84 above.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant Delta Air Lines, Inc., and grant the relief set forth in the Prayer for Relief.

**COUNT VII**

**ADA: INTERFERENCE (42 U.S.C. § 12203(b))**

133.

Plaintiff incorporates by reference paragraphs 1 through 9 and the allegations of Sections A, F, H, and M of the Factual Allegations (paragraphs 10 through 12, 38 through 48, 57 through 62, 84) as if fully set forth herein.

134.

The ADA makes it unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of rights protected by the ADA. 42 U.S.C. § 12203(b).

135.

Plaintiff exercised rights protected by the ADA by taking disability-related medical leave and requesting a reasonable accommodation.

136.

Defendant coerced, intimidated, threatened, and interfered with Plaintiff's exercise of those rights, including by: (a) pressing her for same-day action and warning that her absences "would be unexcused" at the start of her leave; (b) conditioning restoration of her pass travel privileges on her return from disability-related leave; and (c) characterizing her accommodation as a "refusal" and withholding information about the findings against her because she communicated in writing.

137.

As a direct and proximate result, Plaintiff has suffered the damages described in Paragraph 84 above.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant Delta Air Lines, Inc., and grant the relief set forth in the Prayer for Relief.

## COUNT VIII

## FMLA: INTERFERENCE (29 U.S.C. § 2615(a)(1))

138.

Plaintiff incorporates by reference paragraphs 1 through 9 and the allegations of Sections A, D, F, G, J, and M of the Factual Allegations (paragraphs 10 through 12, 29 through 33, 38 through 56, 65 through 70, 84) as if fully set forth herein.

139.

Plaintiff was an eligible employee under 29 U.S.C. § 2611(2): she had been employed by Defendant since May 14, 2018, had worked full time and therefore well over 1,250 hours during the preceding 12 months, and worked at a location where Defendant employed at least 50 employees within 75 miles.

140.

Defendant is an employer under 29 U.S.C. § 2611(4).

141.

Plaintiff was entitled to FMLA leave because of serious health conditions that made her unable to perform the functions of her position, as certified by her treating psychiatrist.

142.

On April 15, 2025, Plaintiff gave Defendant notice of her need for leave. Sedgwick's notice to Plaintiff stated that her "leave request is eligible for family and medical leave" and that her approved leaves would "run concurrently and count toward any applicable FMLA" entitlement. Plaintiff's twelve weeks of FMLA leave ran from April 15, 2025 through approximately July 7, 2025, and Defendant suspended her on June 26, 2025, during that period. Sedgwick approved her leave from April 15, 2025 through May 26, 2025, and later extended it through August 26, 2025.

143.

Defendant interfered with, restrained, and denied the exercise of Plaintiff's FMLA rights, including by:

(a) On April 15, 2025, after Plaintiff's notice of leave, sending her a work request;

(b) On April 16, 2025, contacting her four times in approximately one hour by text and telephone despite her instruction to direct inquiries to Sedgwick;

(c) Telling her it was "imperative" that she act "today" or her absences "would be unexcused," when Sedgwick had given her until at least April 28, 2025;

(d) On May 29, 2025, conditioning restoration of her pass travel privileges on her return to work, thereby using her FMLA leave as a negative factor and withholding a benefit she would otherwise have received, contrary to 29 U.S.C. § 2614(a)(2) and 29 C.F.R. § 825.220(c);

(e) Removing her from the ACPC project while she was on leave; and

(f) Suspending her on June 26, 2025, during her FMLA leave, and initiating the termination review that ended her employment on July 16, 2025.

144.

Plaintiff was prejudiced by this interference. She lost the use of her pass travel benefits during her leave, a benefit with monetary value to her and her family, and she lost her employment, wages, and benefits.

145.

As a direct and proximate result, Plaintiff has suffered the damages described in Paragraph 84 above, and is entitled to the relief provided by 29 U.S.C. § 2617(a), including liquidated damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant Delta Air Lines, Inc., and grant the relief set forth in the Prayer for Relief.

**COUNT IX**

**FMLA: RETALIATION (29 U.S.C. § 2615(a)(1) and (2); 29 C.F.R. § 825.220(c))**

146.

Plaintiff incorporates by reference paragraphs 1 through 9 and the allegations of Sections A, D, F, G, J, K, L, and M of the Factual Allegations (paragraphs 10 through 12, 29 through 33, 38 through 56, 65 through 84) as if fully set forth herein.

147.

Plaintiff engaged in protected activity under the FMLA by: (a) taking FMLA leave beginning April 15, 2025; (b) requesting and receiving an extension of leave through August 26, 2025; and (c) opposing Defendant's interference with her FMLA rights in the June 2, 2025 Complaint to Ms. Smith and senior leadership

and in the identical Ethics and Compliance Helpline complaint she filed the same day.

148.

Ms. Smith, Ms. Rowe, and Ittounas knew of Plaintiff's leave, and Ms. Smith received the June 2, 2025 Complaint, which was addressed to her. Upon information and belief, Vice President McCue also knew of Plaintiff's leave and complaints before her termination.

149.

Defendant took adverse actions against Plaintiff because of her protected activity, including: (a) on May 29, 2025, conditioning restoration of her pass travel privileges on her return from leave; (b) on June 26, 2025, suspending her employment and removing her access, 24 days after her June 2, 2025 complaint; and (c) on July 16, 2025, terminating her employment while she remained on approved medical leave.

150.

The close temporal proximity between Plaintiff's protected activity and these actions, the revival of the dormant investigation only after her complaint, and Defendant's faster treatment of Whyte's investigation during leave establish causation, and Defendant's stated reasons are pretextual.

151.

As a direct and proximate result, Plaintiff has suffered the damages described in Paragraph 84 above, and is entitled to the relief provided by 29 U.S.C. § 2617(a), including liquidated damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant Delta Air Lines, Inc., and grant the relief set forth in the Prayer for Relief.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sanassa Diane respectfully requests that this Court enter judgment in her favor and against Defendant Delta Air Lines, Inc., on all counts, and grant the following relief:

A. A declaration that Defendant's actions violated Title VII, the ADA, and the FMLA;

B. Back pay, including lost wages, profit sharing, and benefits from the date of termination to the date of judgment, less interim earnings as required by law;

C. Reinstatement to her position or, in the alternative, front pay in an amount to be determined at trial;

D. Compensatory damages for emotional distress, mental anguish, pain and suffering, and loss of enjoyment of life under Title VII and the ADA;

E. Punitive damages under 42 U.S.C. § 1981a on her Title VII and ADA claims, for Defendant's malice or reckless indifference to her federally protected rights;

F. Liquidated damages equal to her lost wages, benefits, and interest under 29 U.S.C. § 2617(a)(1)(A)(iii) on her FMLA claims;

G. Damages for medical expenses incurred as a result of Defendant's unlawful conduct;

H. An order restoring Plaintiff's pass travel privileges and other employment benefits that were unlawfully suspended, denied, or revoked;

I. An order expunging from Plaintiff's personnel record all references to the pretextual investigation, the unsupported 2024 boarding-gate allegation, and the wrongful suspension and termination;

J. Pre-judgment and post-judgment interest;

K. Costs and expenses, and reasonable attorney's fees if Plaintiff retains counsel, as authorized by 42 U.S.C. § 2000e-5(k), 42 U.S.C. § 12205, and 29 U.S.C. § 2617(a)(3); and

L. Such other and further relief as this Court deems just and proper.

## VII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted this 28th day of October, 2026.

Sanassa Diane

Sanassa Diane, Pro Se Plaintiff
2870 Peachtree Rd NW #915-5642
Atlanta, Georgia 30305
Email: sanassadiane@outlook.com
Telephone: (347) 862-8238

## VERIFICATION

I, Sanassa Diane, am the Plaintiff in this action. I have read the foregoing Complaint. The facts stated in it are within my personal knowledge, except those stated upon information and belief, which I believe to be true. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. 28 U.S.C. § 1746(1).

Executed on 28th October, 2026, in Atlanta, Georgia.

Sanassa Diane

Sanassa Diane

# INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit 1 | EEOC Notice of Right to Sue, Charge No. 410-2025-11264 (August 6, 2026) |
| Exhibit 2 | EEOC Charge of Discrimination, Charge No. 410-2025-11264 (August 21, 2025) |

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Atlanta District Office**
100 Alabama Street, SW, Suite 4R30
Atlanta, GA 30303
1-800-669-4000
Website: www.eeoc.gov

# DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 08/06/2026

**To:** Mrs. Sanassa Diane
5765 Thornton Dr
CUMMING, GA 30028

Charge No: 410-2025-11264

EEOC Representative and email: MATTHIEU LINEN
INVESTIGATOR
MATTHIEU.LINEN@EEOC.GOV

## DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 410-2025-11264.

On behalf of the Commission,

Digitally Signed By:DARRELL GRAHAM
08/06/2026

DARRELL GRAHAM
DISTRICT DIRECTOR

**Cc:**

Kathleen Mones
Mones Law, P.C.
191 Peachtree Street NE Ste. 3950
Atlanta, GA 30303

Erin Harris
Delta Air Lines, Inc.
1030 DELTA BLVD Dept 981
Atlanta, GA 30354

Please retain this Notice for your records.

# INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court* ***under Federal law****. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to: https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 410-2025-11264 to the District Director at DARRELL GRAHAM, 100 Alabama Street, SW Suite 4R30, Atlanta, GA 30303.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 410-2025-11264 to the District Director at DARRELL GRAHAM, 100 Alabama Street, SW Suite 4R30, Atlanta, GA 30303.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)**

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.
- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
- ✓ **Only one** major life activity need be substantially limited.

- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.
- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.
- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

# CHARGE OF DISCRIMINATION

Form 5 (06/24)

This form is affected by the Privacy Act of 1974.
See attached Privacy Act Statement and other information before completing this form.

| CHARGE PRESENTED TO: | AGENCY CHARGE NO. |
| --- | --- |
| EEOC | 410-2025-11264 |

Name *(indicate Mr., Ms., Mrs., Miss, Dr., Hon., Rev.)*: Mrs. Sanassa Diane

Phone No.: 347-862-8238
Year of Birth: 1995
Mailing Address: 5765 Thornton Dr
CUMMING, GA 30028

Named below is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency that I believe discriminated against me or others.

Name: DELTA AIR LINES INC
No. Employees, Members: 501+ Employees
Phone No.: (404) 714-2690
Mailing Address: 1010 DELTA BLVD
ATLANTA, GA 30354, UNITED STATES OF AMERICA
Name:
No. Employees, Members:
Phone No.:
Mailing Address:

DISCRIMINATION BASED ON:

Disability, National Origin, Religion, Retaliation

DATE(S) DISCRIMINATION TOOK PLACE

Earliest: 02/11/2025
Latest: 07/16/2025

THE PARTICULARS ARE:

On or about May 14, 2018, I began working for above-named Respondent. I am a person with a known disability. During my tenure, I have been subjected to disparate treatment because of my disability, national origin (African) and religion (Muslim). On or about February 11, 2025, while flying with Pass Travel, my husband was detained at the airport because of electronics in his bag. He was first accused of theft, then accused of violating the Pass Travel policy of flying for financial gain. I made a complaint to human resources about his treatment. On or about April 7, 2025, an investigation into his bags and his frequent travels to Africa was launched, yet I heard nothing back regarding my complaint. On or about April 15, 2025, I was forced to take FMLA leave due to my disability. I began to get calls and text from manager Amanda Smith and another manager, Saige Rowe, about my leave. The same day, Ms. Smith continually called and texted me regarding work related matters, despite my leave. The next day, I began to get frequent calls from Ms. Smith about my leave, despite my insistence she direct her inquires to the benefits administrator. On or about April 22, 2025, Sedgwick, the third-party benefits administrator approved my leave from April 15, 2025, until May26, 2025. I continued to be harassed during this time by Ms. Smith. On or about May 26, 2025, I extended my disability related leave until August 2025. On or about May 29, 2025, I was informed my Pass Travel benefits were being suspended. On or about June 2, 2025, I made a protected complaint to senior management and human resources about discrimination based on religion and disability. On or about June 5, 2025, I made an ethics complaint about discrimination based on national origin, specifically about James McCubbins. Mr. McCubbins routinely refers to employes of African origin as the "DSS Crew". This references the airport code of an airport in West Africa. Mr. McCubbins was known for this type of racially insensitive language and actions, as far back as 2023. On or about June 10, 2025, I was called into a meeting with

human resources about my complaints. On or about June 20, 2025, I was told that my complaints were unsubstantiated, despite ample evidence to the contrary. On or about June 22, 2025, I made a reasonable accommodation request and a religious accommodation request. On or about June 26, 2025, I was told I was being suspended for abuse of Pass Travel. On or about July 16, 2025, while still on disability related leave, I was discharged. I am aware of several other individuals that have suffered the same manner of treatment because of their disability status.

The reason given for my discharge was policy violation.

I believe I was discriminated against because of my religion (Muslim), my national origin (African), my disability and retaliated against for engaging in a protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended and Title I of the Americans with Disabilities Act of 1990, as amended.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct, and that I have read each page of this form.

Digitally Signed By: Mrs. Sanassa Diane
08/21/2025

Charging Party Signature & Date

If a state or local Fair Employment Practices Agency (FEPA) requires notarization, you may need to sign the charge in the presence of a notary. If so, please do so here.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information, and belief.

______________________________
Notarized Signature of Charging Party

Subscribed and sworn to before me this date:

Signature of Notary______________________________

Printed Name ______________________________

## CP Enclosure with EEOC Form 5 (06/24)

### Privacy Act Statement

Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **Form Number/Title/Date.** EEOC Form 5, Charge of Discrimination (06/24).
2. **Authority.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.
3. **Principal Purposes.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.
4. **Routine Uses.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.
5. **Whether Disclosure is Mandatory; Effect of Not Giving Information.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### Notice of Right to Request Substantial Weight Review

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so *within 15 days* of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### Notice of Non-Retaliation Requirements

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA, Section 207(f) of GINA, and 42 USC 2000gg-2(f)(1) of the PWFA it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.